UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PLATINUM SPORTS LTD., et al.,

        Plaintiffs,

vs.

Case No. 07-CV-12360

HON. GEORGE CARAM STEEH

THE CITY OF DETROIT, et al.,

        Defendants.
_____/

### ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' AMENDED MOTION FOR PRELIMINARY INJUNCTION [DOC. 31]

Plaintiff Platinum Sports has operated an Adult Group D Cabaret known as "All Stars" in Detroit, Michigan for several years. Plaintiff Shahida Hardaway is an adult entertainer working at All Stars. Defendant, City of Detroit, has passed and enforced various ordinances regulating Adult Group D Cabarets ("Cabarets") and adult entertainers, which are at issue in this lawsuit. The individual defendants are police officers employed by the City of Detroit Police Department's Vice Unit.

Plaintiffs ask the Court to enjoin enforcement of the Adult Cabaret Ordinance ("ACO" or "Ordinance"), Sections 5-2-1 through 5-2-44, and the incorporated Sections 30-1-1 through 30-1-18 of the Detroit City Code. The ACO, in its current form, became effective in 2005. Sections 5-2-1 through 5-2-44 mandate that Class D Adult Cabarets be licensed by the City of Detroit, and that entertainers who perform in Class D Adult Cabarets obtain an adult entertainer identification card from the Detroit Police

Department.  For purposes of this motion, plaintiffs are making only a facial challenge to the constitutionality of the ACO.

Pending before this Court is plaintiffs' amended motion for preliminary injunction, filed on November 7, 2007.  For the reasons set forth below, the Court grants in part and denies in part plaintiffs' amended motion for preliminary injunction.

## STANDARD FOR PRELIMINARY INJUNCTION

The decision of whether or not to issue a preliminary injunction lies within the discretion of the district court.  CSX Transp., Inc. v. Tennessee State Bd. of Equalization, 964 F.2d 548, 552 (6th Cir. 1992).  In determining whether to grant or deny an injunction, the district court is required to consider four factors:

1. whether the movant is likely to prevail on the merits;

2. whether the movant would suffer an irreparable injury if the court does not grant a preliminary injunction;

3. whether a preliminary injunction would cause substantial harm to others; and

4. whether a preliminary injunction would be in the public interest.

Nightclubs, Inc. v. City of Paducah, 202 F.3d 884, 888 (6th Cir. 2000).  The foregoing factors should be balanced.  In re DeLorean Motor Co., 755 F.2d 1223, 1229 (6th Cir. 1985).

A plaintiff must always show irreparable harm before a preliminary injunction may issue.  Friendship materials, Inc. v. Michigan Brick, Inc., 679 F.2d 100, 104 (6th Cir. 1982).  "The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies."  Sampson v. Murray, 415 U.S. 61, 88 (1974)

(citations omitted). When First Amendment rights are implicated, "the crucial inquiry is usually whether the plaintiff has demonstrated a likelihood of success on the merits. This is so because . . . the issues of the public interest and harm to the respective parties largely depend on the constitutionality of the statute." Nightclubs, 202 F.3d at 888.

## ANALYSIS

I. Likelihood of Success on Merits

    A. First Amendment Challenges

Erotic dancing by a nude or partially nude dancer is expressive conduct protected by the First Amendment. Barnes v. Glen Theatre, Inc., 501 U.S. 560, 566 (1991). The First Amendment applies to state and local governments via the Fourteenth Amendment. Plaintiff makes several First Amendment challenges, which will be addressed below.

        1. Prior Restraints

A "prior restraint" exists when one is required to obtain a permit from the government in order to exercise a First Amendment right. Deja Vu of Nashville, Inc. v. Metropolitan Government of Nashville and Davidson County, Tennessee, 274 F.3d 377, 400 (6th Cir. 2001) (hereinafter "Deja Vu I"). "[A]ny system of prior restraint carries a heavy presumption against its validity." Id. at 391 (quoting Nighclubs, 202 F.3d at 889). Because the ACO requires that Cabarets be licensed in order to operate, and mandates that entertainers obtain an adult entertainer identification card before dancing in a Cabaret, the ACO operates as a prior restraint.

3

The Supreme Court has held that three procedural safeguards are mandated to protect against the suppression of protected expression by prior restraint. Freedman v. Maryland, 380 U.S. 51 (1965). First, any restraint before judicial review occurs can be imposed only for a specified brief period during which the status quo must be maintained. Second, prompt judicial review of a decision regarding a prior restraint must be available. Third, the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof in court. Id. at 58-59.

The Sixth Circuit has held that "licensing schemes in a city ordinance regulating sexually oriented businesses constitute a prior restraint that must incorporate at least the first two Freedman procedural safeguards." Deja Vu I, 274 F.3d at 400-01. In its most recent opportunity to address the issue, the Sixth Circuit reiterated, "[f]irst, 'any restraint prior to judicial review can be imposed only for a specified brief period during which the status quo must be maintained.' Second, there must be prompt judicial review of the licensor's decision, which includes a prompt judicial decision." 729, Inc. v. Kenton County Fiscal Court, __ F.3d __, 2008 WL 313054, *7 (citing FW/PBS v. Dallas, 493 U.S. 215, 227-30 (1990).

Plaintiffs argue that §§ 5-2-25 and 5-2-26, 5-2-34, 5-2-35, 5-2-36, 5-2-38 and 5-2-44 are unlawful prior restraints because they do not specify a brief period of time for licensing decisions, do not preserve the status quo and do not provide for adequate judicial review.

a. <u>Cabaret Owner's License</u>

(1) 5-2-25

Section 5-2-25 is entitled "Inspection and approval of premises; structural, fire safety, and sanitation requirements", and provides that before a Cabaret owner's license will be issued or renewed, the application will be referred to various City departments and agencies for certification that the premises comply with such things as the Michigan Building Code, the Detroit Property Maintenance Code, the Detroit Fire Prevention Code, the Michigan Electrical Code and the Michigan Plumbing Code. However, the Ordinance does not provide for a specific time period for completion of the required inspections or certification. Nor does the section specify a brief period of time during which, at least as to renewal applications, the status quo is maintained. Plaintiffs have a strong likelihood of success on the merits in arguing that § 5-2-25 is an unconstitutional prior restraint.

(2) 5-2-26

Section 5-2-26(a)(1) mandates that the Consumer Affairs Department refer an application for a license to the Chief of Police, who shall conduct an investigation to determine if the applicant has been convicted of a delineated offense during the past five years, including any felony concerning fraud, embezzlement, dishonesty or assaults. Section 5-2-26(a)(2) requires the Consumer Affairs Department to refer an application for a license to the Finance Director, so that an investigation may be conducted "to determine whether any City property tax, City income tax, and/or special City assessments are unpaid, outstanding and/or delinquent."

This section does not contain any time limits, let alone a specified brief period, within which the Consumer Affairs Department, the Chief of Police or the Finance Director must act. Nor is there a provision that preserves the status quo while the Consumer Affairs Department, Chief of Police or Finance Director act to comply with the requirements of § 5-2-26. Recognizing that the status quo for a licensed Cabaret is the ability to remain operating, and this status quo is not maintained in the provisions relating to the renewal of a Cabaret owner's license, plaintiffs have a likelihood of success on the merits of their argument that § 5-2-26 is an unconstitutional prior restraint.

The ACO is silent on the issue of judicial review, but Detroit's Ordinance at § 30-1-17 allows applicants denied a license to contest the denial, and sets forth time periods governing this process. Section 30-1-17 provides that a disappointed license applicant may request a hearing within 30 days, and that the hearing shall be scheduled within 30 days of such request. Disappointed applicants may appeal an adverse decision in accordance with Michigan and federal court rules. The Sixth Circuit has noted that the Michigan Court Rules provide numerous avenues for expedited hearings on declaratory relief as well as trials and appeals, and that this satisfies the second prong of Freedman. Bronco's Entertainment, Inc. v. Charter Twp. of Van Buren, 421 F.3d 440, 447 (6th Cir. 2005). The Sixth Circuit recently addressed this very issue in 729, Inc.. Referring to the Supreme Court's decision in City of Littleton v. Z.J. Gifts, 541 U.S. 774 (2004), the Sixth Circuit found that ordinary judicial review "practices and procedures" satisfy the requirement of prompt judicial review, as long as the licensing regulation "applies reasonably objective, nondiscretionary criteria . . . unrelated to the content of

the expressive materials that an adult business may sell or display." 729, Inc., 2008 WL 313054, *10 (quoting Z.J. Gifts, 541 U.S. at 782-84). The Court recognized the importance of preserving the status quo during the pendency of a license application, and during the various penalty proceedings. Id.

Therefore, a Cabaret owner seeking appeal is provided with sufficient judicial review for the Ordinance to pass constitutional muster, as long as the status quo is maintained during the pendency of the licensing application and during judicial review. In this case, the status quo is not preserved, so a cure of that aspect of the ACO is required for this additional reason.

### (3) 5-2-44

Section 5-2-44 incorporates the review procedures of Chapter 30 of the ACO. Specifically, this section provides that a Cabaret license may be revoked or denied renewal in accordance with Chapter 30. Chapter 30 provides an administrative review process, and preserves the status quo during the period from the date of revocation to the date of the hearing. After the revocation hearing, the status quo is no longer maintained if the licensee files an appeal of a revocation order to a court. This result is a prior restraint, which likely renders the provision unconstitutional.

### b. Performer's Identification Card

#### (1) 5-2-34

Section 5-2-34 of the ACO provides that the Police Department shall issue or renew an adult entertainer identification card to an applicant only with a criminal record clearance that does not indicate a record of conviction within two years for certain criminal offenses. However, the section does not set a time limit for the Police

7

Department to act. This section also requires clearance from 36th District Court and the Police Department Public Vehicle Unit, again without setting a time limit for approving or denying an application. In addition, there are no provisions for maintaining the status quo while a determination on the application is pending. Plaintiffs, therefore, have a likelihood of success on the merits with their argument that § 5-2-34 is an unconstitutional prior restraint.

While the ACO does not contain a provision for judicial review, disappointed applicants may appeal an adverse decision in accordance with Michigan or federal court rules, as noted above. Failure of the ACO to maintain the status quo during judicial review is likewise a problem in this section.

(2) 5-2-35

Section 5-2-35 authorizes the suspension of an adult entertainer's right to perform indefinitely to allow the Police Department to update the information contained on the card, including the addition of a new Cabaret. There is no time limit for the Police Department to act, and the status quo is not preserved. Plaintiffs have a likelihood of success on the merits that § 5-2-35 is unconstitutional as a prior restraint.

(3) 5-2-36

Section 5-2-36 provides that an adult identification card is the property of the Police Department and must be surrendered to the Police Department under certain circumstances. The adult entertainer is prevented from performing while an administrative review is conducted. The status quo is not maintained pending the administrative review. Because § 5-2-36 does not maintain the status quo, plaintiffs

8

have a likelihood of success on the merits that the section is an unconstitutional prior restraint.

(4) 5-2-38

Section 5-2-38 authorizes a police officer to demand surrender of an adult entertainer identification card without any limitations on the officer's purported justification. This section criminalizes a dancer's refusal to surrender the card, and prevents an adult entertainer from performing until that entertainer recovers the card from the Police Department. There is no time limit for returning the card, and no preservation of the status quo. Plaintiffs have a likelihood of success on the merits of their argument that § 5-2-38 is unconstitutional as a prior restraint.

2. Civil Disabilities

The City first challenges plaintiffs' standing to challenge the civil disability provisions of the ACO. The City may deny an adult cabaret D business license to an applicant for the reasons stated in § 5-2-26, and may deny an adult entertainer an identification card for the reasons stated in § 5-2-34. These types of provisions are known as "civil disability provisions." Several courts have required that to establish standing to challenge a civil disability provision, plaintiff must show both (1) a conviction of any of the enumerated crimes, and (2) that the conviction was recent enough to prevent the issuance of a license. See Deja Vu of Cincinnati v. Union Township Board of Trustees, 411 F.3d 777 (6th Cir. 2005) ("Deja Vu II").

The plaintiffs in this case have been cited for violating the City's ACO, and their conviction will prevent them from renewing their license and identification card. The

9

Court is satisfied that the plaintiffs have standing to assert their challenges to the civil disability provisions.

The First Amendment prohibits denying one a license based on prior convictions not reasonably related to the purpose of the ordinance. The Sixth Circuit upheld a civil disabilities provision disqualifying as licensees those owners and entertainers who had committed a felony sex crime within the last five years or a misdemeanor sex crime within the last two years as constitutional because such provisions furthered the government's interest in battling secondary effects of the sex industry while imposing only an incidental burden on First Amendment rights. Deja Vu I, 274 F.3d at 392.

The civil disability provisions at issue in this case are somewhat broader. Section 5-2-26 prohibits issuance or renewal of a license to an applicant convicted of "any offense during the past five (5) years involving . . . any felony concerning fraud, embezzlement, dishonesty or assaults". Section 5-2-34 prohibits issuance or renewal of an application for an adult entertainer identification card to a dancer who has been convicted within the preceding two years for a violation of Sections 5-2-4 (dancer engaged in disorderly conduct on premises, soliciting a sex act, or engaging in sex act) or 5-2-10 (using adult entertainer to perform secondary services on same day as performing). Plaintiffs argue the crimes listed as constituting civil disabilities are not "direct and substantial" to the City's interest in combating the secondary effects associated with sexually oriented businesses.

There has been some evidence in this case identifying assaults associated with cabarets as a secondary effect the City wishes to address. (Affidavit of Vicki Yost, ¶ 11). In addition, narcotics violations and weapons offenses are identified as problems

associated with cabarets. (Id.) There is a direct and substantial relationship between section 5-2-26's prohibition of a license when there has been a conviction of a felony assault and the prevention of violence. There is also an argument to be made in support of rejecting a license when there is a felony conviction concerning dishonesty. See DLS, Inc. v. City of Chattanooga, 107 F.3d 403, 414-15 (6th Cir. 1997) (upholding the use of moral turpitude as a disabling offense). However, the City has not demonstrated a direct and substantial relationship between the offenses of fraud and embezzlement and the secondary effects sought to be eradicated in this case.

The Detroit City Code contains a severability provision as follows:

**Sec. 1-1-10. Severability of parts of Code.**

> Should any section, paragraph, sentence, clause, phrase or word of this Code be declared invalid or unconstitutional by a court of competent jurisdiction, such invalidity or unconstitutionality shall not affect any of the remaining words, phrases, clauses, sentences, paragraphs or sections of this Code, since the same would have been enacted by the city council without the incorporation in this code of any such invalid or unconstitutional word, phrase, clause, sentence, paragraph or section.

The Court will follow the intent of the City Council that any portions of the City Code, which includes the ACO, which might be found unlawful shall be severed. There are some instances, however, where the right affected is such that severing is not possible. In those instances, the entire section will be enjoined. See, Top Flight, Inc. V. City of Inskster, Case No. 12399, Order Granting in Part and Denying in Part Plaintiffs' Motion for Preliminary Injunction (J. Edmunds, February 26, 2007).

Regarding section 5-2-26, the Court's preliminary injunction will effectively strike the words "fraud" and "embezzlement" from the list of felonies that will result in the prohibition of a new or renewed license. The Court does not find a likely First

11

Amendment violation in section 5-2-34, as the offenses described are directly related to the secondary effects sought to be addressed by the ACO.

### 3. Performer's Identification Card Fee

The ACO imposes a yearly fee of $250 for the issuance and administration of the licensing scheme for an individual to perform in up to five cabarets. Plaintiffs contend the City is imposing a tax upon the exercise of a constitutional right. The City may impose a fee that is incidental to an otherwise valid licensing scheme, but the fee must be a "nominal fee imposed as a regulatory measure to defray the expenses of policing the activities in question." Murdock v. Pennsylvania, 319 U.S. 105, 113-14 (1943). The fee must be reasonably related to the expenses incident to the administration of the ordinance. Deja Vu I, 274 F.3d at 395. When the licensing scheme is imposed to combat "secondary effects", as it is in this case, the court is to consider three questions:

> (1) whether the fee's maximum amount will deter the exercise of First Amendment rights, (2) whether the measures the cost of which the County seeks to transfer to licensees via its fee structures are narrowly tailored means of advancing the County's interest in curbing secondary effects, and (3) whether the County's cost estimates for those measures are reasonable.

729, Inc., 2008 WL 313054 at *13. The 729, Inc. case came out after briefing in this case was complete, and the parties only addressed the third question, whether the cost estimates are reasonable.

The City claims that the $250 fee charged adult entertainers is "based upon the cost of issuance and administration of the licensing regulations." In 1971 the City first began charging dancers fees as part of its identification card process. The fee was $25, and remained unchanged until 2001. At that time, Police Sergeant Woodrow Myree

suggested that the fee be increased based on inflation, salary increases for the officers assigned to the unit, the necessity for new equipment to maintain data on the dancers, monitoring by unit officers, and the ability to be more effective in the operation of the unit. Sergeant Myree recommended a $250.00 fee for a new applicant and renewal, and a $125 fee for a lost or stolen dancer identification card. Upon the filing of this lawsuit, the City engaged an independent cost accountant/financial analyst, Mauricio Kohn of Kohn Financial Consultants. Mr. Kohn estimated the revenues generated by the fee total $420,000 to $430,000 per year. Replacement card fees generated by the $125.00 fee total $15,000 per year.

    Mr. Kohn analyzed three main categories of direct costs: (1) costs incurred by the City in the initial application process; (2) costs incurred in the enforcement, monitoring and reporting of violations of the City's regulations; and (3) costs incurred in prosecuting violations of the City's regulations applicable to adult entertainers. The totals are as follows: Application process - $63.93 per card, $115,000 total per year. Enforcement, monitoring and reporting - $148.92 per card, $267,868 total per year. Prosecution Costs - $37.60 per card, $67,689 total per year. Using these cost figures, the grand total per card is $250.35 and the grand total per year is $450,628. Mr. Kohn did not include overhead or prosecution incurred by individual districts, as opposed to the Vice Section, or involving Michigan Liquor Control Commission cases, in his cost assessment.

    There is enough evidence at this stage to conclude that the City's cost estimates are reasonable. Without direct evidence on the other considerations, the Court is not in a position to conclude that the fee will deter the exercise of First Amendment rights, or

that the measures taken under the licensing scheme are not narrowly tailored to address the City's interest in curbing secondary effects. On the record before the Court, the plaintiffs have not demonstrated a likelihood of succeeding on the merits, and their request for a preliminary injunction as to the fee charged for dancer identification cards is denied at this time.

4. Restrictions on Simulated Sexual Acts

Plaintiffs claim that Section 5-2-4(c)(2) is an unconstitutional restriction on protected speech. This section at issue provides**:**

> (c) It shall be unlawful for any operator, his or her employee or agent, adult entertainer, or any person on the premises to engage in, or to permit, the following conduct upon the premises:
>
> (2) The erotic caressing or fondling of the female breast, the male or female buttocks, or the male or female genitals or pubic region by another person;

The very aspect of nude dancing that the First Amendment is intended to protect is the erotic message. Barnes, 501 U.S. 560, 581. Plaintiffs argue that this section is directed to activity that conveys the message of eroticism or sexuality, as it is targeted to "erotic" caressing or fondling.

Section 5-2-4(c)(2) specifically inhibits the range of actions that performers can employ during their performance as it relates to touching by *another person*. At oral argument, plaintiffs indicated that they do not have a problem with the section as it relates to contact between a performer and a patron, but they focus their concerns on self-touching and touching between two performers. By limiting the prohibited actions to caressing or fondling of a variety of body parts "by another person", the section does not

14

apply to self-touching by a performer.  The only issue the Court will focus on is touching between two performers.

The prohibition of contact between two performers during a performance is a content-based restriction that must pass strict scrutiny in order to be found constitutional.  "To survive strict scrutiny, the provision must be necessary to serve a compelling state interest and be narrowly drawn to achieve that end."  Schultz v. City of Cumberland, 228 F.3d 831, 840 (7th Cir. 2000) (citing Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd., 502 U.S. 105, 118 (1991)).  The compelling state interest discussed by the City is the prevention of the secondary effect of sexually transmitted diseases.

The Sixth Circuit addressed an ordinance which required a six foot buffer zone around the performers to further the state interest of preventing crime and disease. DLS, Inc. v. City of Chattanooga, 107 F.3d 403 (6th Cir. 1997).  This, of course, would only prevent performer-patron contact, which is not an issue in this case.  The court in DLS found that crime and health were legitimate state interests in that case, after looking at the evidence presented by the defendants on both issues.  Before finding that the prevention of disease was a concern, the court discussed evidence that officers had witnessed contact between performers and patrons, including "couch dances".  There was also evidence from the health department that such contact posed a risk of the transmission of disease.  Finally, a particular dance involving the spooning of whipped cream off of a dancers' body was described in the record.

Of course, for purposes of this motion, the constitutional violation alleged is a facial one.  There has been no evidence submitted as to the risk of the spread of

15

disease from performer-performer touching, however, the Court is inclined to believe that there is a significant risk of spreading disease from the "erotic caressing or fondling" of the genitals or pubic region by another person. The Court believes that section 5-2-4(c)(2) likely does withstand strict scrutiny analysis, and that plaintiffs' challenge on this issue does not have a likelihood of success on the merits.

     5. <u>Disclosure of Personal Information</u>

Plaintiff Hardaway requests the Court enjoin disclosure of any personal information disclosed during the application process to the public, or that the City agree that the personal information will not be released to the public and that such personal information is not subject to disclosure under Michigan's Freedom of Information Act. The Sixth Circuit has fashioned a remedy whereby the names, addresses and other information gathered pursuant to an adult entertainment ordinance's provisions constitute protected private information that are exempted from a state's open records act. See <u>Deja Vu II</u>, 411 F.3d at 794; <u>Deja Vu I</u>, 274 F.3d at 394-95.

The City submits the affidavit of Ellen Ha, which states that the City does not release personal information to the general public in response to FOIA requests. Since there is no objection from the City, and the law on the issue is clear, the injunction issued under this Order will include the provision that any personal information collected under the ACO will not be disclosed under the FOIA.

  B. <u>Fourth Amendment Challenge</u>

Section 5-2-6 provides that members of the Police Department or any City department authorized by the ACO, "may enter the premises at reasonable times to inspect, subject to constitutional restrictions on unreasonable searches and seizures."

16

Plaintiffs argue that section 5-2-6 gives the City's agents the right to enter and inspect the premises without a warrant and without any limitations on the scope of the inspection or the places where the inspection may be conducted, in violation of the Fourth Amendment.

Three district court cases from the Sixth Circuit, as well as one appellate case, support the conclusion that in order for a warrantless inspection clause to pass constitutional muster, it must be limited to inspections at reasonable times, referring to regular business hours, and must be restricted to areas of the premises which are open to the public.  See, Deja Vu II, 411 F.3d at 796; Ellwest Stereo Theater, Inc. v. Boner, 718 F.Supp. 1553, 1577 (M.D. Tenn. 1989); J.L. Spoons, Inc. v. City of Brunswick, 49 F.Supp.2d 1032, 1039-41 (N.D. Ohio 1999); Kentucky Restaurant Concepts, Inc. v. City of Louisville, 209 F.Supp.2d 672, 691 (W.D. Ky. 2002).  The City directs the Court to cases which hold that sexually oriented businesses are pervasively regulated businesses, such that the owners have a reduced expectation of privacy.  Against this backdrop, various courts from other circuits have held that inspections of sexually-oriented businesses without a warrant are constitutional if they are limited to times when the premises are occupied or open for business.  These cases permit searches of areas not open to the public.  See, FW/PBS, Inc. v. City of Dallas, 837 F.2d 1298, 1306 (5th Cir. 1988).  In light of the court's treatment of the issue in Deja Vu II, it is not likely that the Sixth Circuit will follow the Fifth Circuit's approach.

The section at issue limits searches without a warrant to "reasonable times", and "subject to constitutional restrictions on unreasonable searches and seizures."  The section is likely to be interpreted in this Circuit as being limited to inspections during

17

regular business hours, and of public areas only. The general limiting language of the Ordinance probably saves this provision from plaintiffs' facial challenge; thus, no injunctive relief will be granted at this juncture.

    C.  <u>Fourteenth Amendment Challenge - Operator Liability</u>

Section 5-2-5(a) provides that an operator and his or her employees shall not permit or allow customers to do any of the acts prohibited by the ACO. Subsection (b) provides that "[w]hether or not a violation of this article is committed with his or her knowledge, an operator is responsible for any violation of this article by any of his or her employees or agents." Plaintiffs contend that the strict liability aspect of this section violates the First Amendment because it imposes strict liability with no showing of criminal intent required to establish guilt. The City argues that the operator is in a position to prevent violations by terminating employees who do not ensure that the dancers have proper identification cards, and refusing to hire dancers who violate the ACO.

The section at issue imposes strict liability on the operator of a cabaret. The City asserts this provision only subjects operators to fines or penalties short of jail. However, plaintiffs point out that the term "operator" is defined in the ACO as "any individual, or such individual's employee or agent, who operates a Group "D" Adult Cabaret". Several of plaintiff's employees have received tickets under 5-2-5(b). Convictions carry 90 day jail sentences and substantial fines.

The City also argues that no *mens rea* is required under the rubric of a "public welfare offense." <u>Morissette v. United States</u>, 342 U.S. 246, 256 (1952). The element of criminal scienter is dispensed with due to the regulatory nature of certain ordinance

18

schemes. Id. In this case the ACO is essentially a public welfare regulatory measure. While the Court generally agrees with the City's argument that the operator is in the best position to prevent violations, the constitution does not permit finding an operator criminally responsible for hiring a dancer if he had a good faith belief that her dance card was valid, but it turned out not to be valid. See American-Arab Anti-Discrimination Comm. v. City of Dearborn, 418 F.3d 600, 612 (6th Cir. 2005). This is especially true in this case where it appears there is no effective means to identify counterfeit dancer identification cards and the Ordinance fails to provide a single, fast process by which operators can verify such cards. In addition, the Supreme Court has held that in criminal prosecutions which implicate First Amendment rights of free expression, the State must prove that a defendant has criminal scienter to establish guilt. Smith v. California, 361 U.S. 147 (1959).

Plaintiffs have established a likelihood of success on the merits of their argument that section 5-2-5(b) is unconstitutional.

## CONCLUSION

For the reasons stated in this opinion and order, plaintiffs' amended motion for preliminary injunction is granted in part and denied in part. Plaintiffs shall present a proposed preliminary injunction order in accordance with this ruling.

Dated: March 6, 2008

S/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on March 6, 2008, by electronic and/or ordinary mail.

s/Josephine Chaffee
Deputy Clerk